IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

Rose Cook,                              §
                                        §
              *Plaintiff,*              §
                                        §
v.                                      §          Civil Action H-13-1321
                                        §
Morgan Stanley Smith Barney,            §
                                        §
              *Defendant.*              §

## Memorandum Opinion & Order

Pending before the court is defendant Morgan Stanley Smith Barney, LLC's ("MSSB")

motion for summary judgment on plaintiff Rose Cook's claims that MSSB failed to reasonably

accommodate her disability and retaliated against her in violation of the Americans with Disabilities

Act of 1990, 42 U.S.C. §§ 12101 et seq. ("ADA") and the Texas Commission on Human Rights Act.

Dkt. 54.  Upon consideration of the parties' pleadings, the summary judgment evidence, and the

applicable law, the court finds that MSSB's motion for summary judgment should be **DENIED**.

### I. Background

Smith Barney hired Cook as a Branch Manager in 2000.  She started working at its

downtown office, and she was promoted to Compliance Officer in 2004.  Dkt. 55 at 4.  In 2009,

Smith Barney merged with Morgan Stanley, and Cook was retained as a Complex Risk Officer,

operating at the same location.  *Id.*  Cook's direct supervisor was Senior Complex Risk Officer

Helen Champagne ("Champagne"), who worked at the Galleria location in Houston.  Dkt. 54 at 3.

Cook also worked with Regional Risk Officer Jill Richmond ("Richmond"), who was located in

Dallas.  *Id.* at 2.

In July 2011, Cook reported to Human Resources Representative Shelly Hance ("Hance") that tension had developed between her and Champagne.  Dkt. 55 at 5.  Subsequently, Hance and Richmond initiated plans to improve communication between Cook and Champagne, which included a meeting scheduled for November 9, 2011.  *Id.*; Dkt. 55, Ex. U; Dkt. 54, Ex. C at 122, 124.

Prior to the scheduled meeting, in September 2011, Cook's cardiologist, Dr. Yoel Vivas ("Vivas"), diagnosed Cook with Premature Ventricular Contractions ("PVC"), a condition in which abnormal heart beats disrupt the heart's ordinary rhythm.  Dkt. 55 at 5; Dkt. 55, Ex. H.  Additionally, Cook was diagnosed with General Anxiety Disorder by her therapist, Margaret Bruce, L.P.C. ("Bruce"), in October 2011.  Dkt. 55 at 5; Dkt. 54, Ex. E at 22.  Cook notified Hance, Richmond, and other managers in November that she was taking a medical leave, and she began her leave of absence on November 8, 2011, after MetLife, MSSB's third-party administrator, approved her request under the Family Medical Leave Act ("FMLA").[1]  Dkt. 55 at 6 & Ex. C.

On November 9, 2011, Richmond met with Champagne and the Complex Manager for the Galleria location, Matt Kabot ("Kabot"), and recommended that Cook be transferred to the Galleria office in order to provide her with cross-training and exposure to new policies and procedures that had been implemented after the merger.  Dkt. 54, Ex. C at 35, 38.  Richmond also believed that it was necessary for Cook and Champagne to work at the same office to improve communication and

---

[1]  Cook's email requesting leave stated: "My doctor thinks I should take a paid medial leave of absence beginning tomorrow.  The stress and my medical condition over the past 3 months has taken its toll on my health, and I am being advised not to jeopardize my health any further.  My health is very important to my long term success, and I hope you will understand and support my decision to follow my doctor's advisement.  I will submit my doctor's letter in the next couple of days.  The timeframe will depend on the doctor. . . ."  Dkt. 55, Ex. C.

the business relationship between them.  *Id.*  Kabot and Champagne agreed with Richmond's suggestion.  Dkt. 54, Ex. B at 120, 122.  Cook was not a party to that discussion.  *Id.* at 124.

Cook's primary care physician, Dr. David Mabry, prescribed medication for her anxiety to Cook while she was on medical leave.  Dkt. 54 at 6.  On December 12, 2011, Mabry authorized Cook to begin working four hours a day with no travel "except to main work location."  Dkt. 55, Ex. D.  Cook returned to her downtown office at MSSB on December 14, 2011.  Dkt. 55 at 6.  The following day, Kabot informed Cook that she had been reassigned to the Galleria office.  *Id.*  Believing that a change in location violated Mabry's orders, Cook contacted her MetLife caseworker, who instructed Cook to return home on medical leave.  *Id.*  Cook remained on leave through January 2012.  Dkt. 54 at 8.

On February 1, 2012, Mabry wrote a letter to MetLife authorizing Cook to work on a part-time basis for three weeks beginning on February 6, 2012, at "only" the downtown office "to eliminate stress and new challenges."[2]  Dkt. 55, Ex. F.  On February 3, 2012, the Executive Director of Human Resources for MSSB told Hance in an e-mail that Mabry's request was "not an accommodation that a physician can or should request," and instructed Hance not to make the modifications.  Dkt. 55, Ex. W.  This decision was not communicated to Cook, and when she arrived for work at the downtown office on February 6, she was told to report to the Galleria location.  Dkt. 55 at 7.  Cook objected that the relocation contradicted Mabry's orders, and she was told to return home until the matter could be resolved.  *Id.*  Cook was placed on unpaid leave.  *Id.*

_____

[2]  On February 17, 2012, Dr. Yoel Vivas submitted a letter to MetLife, verifying the recommendations submitted by Mabry regarding stress and anxiety.  Dkt. 55, Ex. H.

Cook and the MSSB Human Resources Department continued to communicate through March 2012, but they failed to reach a resolution to the location issue.  Dkt. 54 at 9.  Hance sent Cook a letter on March 2, 2012, in which she informed Cook that she left Cook a voicemail on February 28 and attempted to call again on March 1.  Hance asked Cook to give her a call.  Dkt. 54, Ex. M.  On March 5, 2012, Cook emailed Hance and stated that she had received a MetLife disability claim letter and was appealing it.  Cook advised Hance that she did not "want to jeopardize [her] job status" and requested information about her "current job status and the availability of any other leave options."  Dkt. 54, Ex. N.  Hance advised that she would call Cook, but Cook missed the call.  *Id.* Cook emailed back and requested a telephone appointment the following day.  *Id.*  At some point, this call occurred, and Hance advised Cook that she would send Cook some forms to complete regarding her accommodation request.  Cook testified that she received these forms from Hance. Dkt. 54, Ex. A at 268.

Eventually, Cook retained attorney Bruse Loyd ("Loyd"), who sent MSSB a letter on April 2, 2012.  Dkt. 54, Ex. O.  Loyd requested to discuss reasonable accommodations for Cook. *Id.*  Loyd advised that the accommodation Cook sought was to be allowed "to work in the office location she has always worked rather than tranfer[red] . . . to an office that will not accommodate her disability . . . ."  *Id.*  MSSB's counsel responded on April 13, 2012, and enclosed the "Employee Request for Reasonable Accommodation" form and "Health Care Provider Questionnaire" for Cook to complete as part of "engaging in the interactive process."  Dkt. 54, Ex. P.  Loyd faxed the completed forms to Hance on April 20, 2012.  Dkt 54, Ex. Q.

In the Request for Reasonable Accommodation form, Cook requested the following accommodation:

4

> As recommended by doctors, simply the same location I have always officed with familiar supportive surroundings to regain full workload capacity in a less stressful environment and not creating new challenges.  Part-time basis for 4 weeks while being monitored by health professionals.  Work location 717 Texas Avenue and no additional travel until full doctor's release.

*Id.*  Cook's counselor, Bruce, completed the health care provider questionnaire. *Id.*  In response to a question about what accommodations would enable Cook to perform the essential functions of her job, Bruce stated: "Return to work to familiar environment with change in supervisor." *Id.*  As far as the length of time for the accommodation, Bruce stated: "Part time for one month to stabilize and adjust to work environment.  Then reevaluate." *Id.*

On May 15, 2012, Cook filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging disability discrimination and retaliation.  Dkt. 55, Ex. J.  The EEOC terminated its investigation on December 3, 2012, and issued Cook a notice of right to sue.  Dkt. 55 at 9 & Ex. K.  On December 5, 2012, Hance emailed MetLife requesting an update on Cook's case for the first time since May 30, 2012.  Dkt. 55, Ex. X.  MetLife informed Hance that "Cook's request for long term benefits had been denied."  Dkt. 55 at 9.  Hance then asked her assistant to "send an urgent request to MetLife for the denial letter and date Rose Cook was notified of denial."  Dkt. 55, Ex. Y.  MSSB terminated Cook's employment via an email from Hance on December 10, 2012.  *Id.*, Ex. L.

## II. LEGAL STANDARDS

### A. Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505 (1986).  An issue is "material" if its resolution could affect the outcome of the action.  *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).  "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact.  *Id.* at 322.  If the moving party fails to meet this burden, then it is not entitled to a summary judgment, and no defense to the motion is required.  *Id.*  "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995); *Celotex*, 477 U.S. at 323–25.  To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting FED. R. CIV. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008).  The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached.  *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).  However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation."  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  Similarly, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts."  *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *Galindo v. Precision Amer. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

## B.     Failure to Reasonably Accommodate Standard

The ADA provides that no entity "shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees . . . and other . . . privileges of employment."  42 U.S.C. § 12112(a).  A qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds."  42 U.S.C. § 12111(8).  A disability is "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).

Under the ADA, discrimination against a qualified individual includes failing to make reasonable accommodation for that individual unless such accommodation would impose an undue hardship on the entity.  42 U.S.C. § 12112(b)(5)(A).  Reasonable accommodations include "making existing facilities used by employees readily accessible to and usable by individuals with disabilities[,] job restructuring, part-time or modified work schedules, reassignment to a vacant position . . . and other similar accommodations."  42 U.S.C. § 12111 (9)(A)-(B).  To decide what reasonable accommodations will be implemented, the entity should engage in an informal, interactive process with the individual to assess the limitations caused by the individual's disability and the possible accommodations that would overcome those limitations.  29 C.F.R. § 1630.2(o)(3).

When an employee's limitations caused by a disability are not "open and obvious" to the employer, it is the employee's responsibility to notify the employer of the limitations and suggest a reasonable accommodation.  *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009) (citing *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996)).  Then, the employer must engage in a good faith interactive process, which is "a meaningful dialogue with the employee to find the best means of accommodating that disability."  *Id.* (quoting *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108 (1st Cir. 2005)).  While the employee is entitled to reasonable accommodations, the employer is not obligated to adhere to the employee's preference and has final discretion as to the most effective accommodations that satisfy both the employee's and employer's needs.  *EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 471 (5th Cir. 2009) (citing 29 C.F.R. pt. 1630, App., § 1630.9).

Thus, in a failure to accommodate claim under the ADA, the employee bears the burden of demonstrating that the employer failed to implement a reasonable accommodation.  *Riel v. Elec.*

*Data Sys. Corp.*, 99 F.3d 678, 682 (5th Cir. 1996).  If the employee meets this burden, the employer may utilize the affirmative defense that the accommodation would constitute an undue burden or that it would counteract a business necessity.  *Id*.

## C.    Retaliation Standard

For a plaintiff to establish a prima facie case of retaliation, she must show that: (1) she engaged in a protected activity; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse action.  *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 657 (5th Cir. 2012).  If the plaintiff successfully presents a prima facie case, the burden shifts to the employer to provide a legitimate, non-retaliatory reason for the adverse employment action.  *Id.*  After the employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation.  *LeMaire v. La. Dept. of Transp. and Dev.*, 480 F.3d 383, 388-89 (5th Cir. 2007).  Specifically, the plaintiff must prove that she would not have experienced an adverse employment action "but-for engaging in protected activity."  *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 685 (5th Cir. 2001).   A plaintiff may avoid summary judgment and show but-for causation by demonstrating a conflict in substantial evidence on this ultimate issue.  *Hernandez*, 670 F.3d at 660.  "Evidence is 'substantial' if it is of such quality and weight that [a] reasonable and fair-minded [jury] in the exercise of impartial judgment might reach different conclusions."  *Id.* (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996)).  At all stages of the analysis, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains...with the plaintiff."  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S. Ct. 2742 (1993) (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089 (1981)).

### III. ANALYSIS

#### A.    Evidentiary Issue

In her response to MSSB's motion for summary judgment, Cook moves to strike the affidavit of Nancy Patterson, who represents MSSB in this action, arguing that the affidavit "should be rejected as inadmissible pursuant to FRE 408." Dkt. 55 at 23. In the affidavit in question, Patterson states that during the interactive process "to see if there was any accommodation that could be made to facilitate Ms. Cook's return to work, . . . . Mr. Loyd advised that his client would not be returning to work at MSSB" and "would move forward with filing a claim against MSSB." Dkt. 54, Ex. R. Cook objects to the affidavit because it "claims to relate the contents of conversations with Cook's counsel in connection with settlement talks." *Id.* MSSB argues that Rule 408 does not apply because the affidavit is offered to document its efforts to resolve the accommodation request, not prove liability or to impeach. Dkt. 56-1 at 10 n.38.

Under Federal Rule of Evidence 408, "a statement made during compromise negotiations about the claim" is not admissible "either to prove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408(a)(2); *Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ.*, 579 F.3d 546, 551 (5th Cir. 2009). In its motion for summary judgment, MSSB cites Patterson's affidavit in support of its argument that Cook refused to return to work without a change in supervisor. Dkt. 54 at 10, 19. The evidence is being used not to show liability but to show that MSSB was engaging in the interactive process. *See Linebarger v. Honda of Am. Mfg., Inc.*, 870 F. Supp. 2d 513, 521 n.2 (S.D. Ohio 2012) ("The Court is not persuaded by Plaintiff's argument that interactions between counsel regarding accommodations are not admissible evidence in view of Federal Rule of Evidence 408, which

generally prohibits the introduction of evidence regarding offers of compromise or settlement, as these communications were made in an effort to reach a consensus on a reasonable accommodation."); *Linebarger v. Honda of Am. Mfg., Inc.*, No. 2:10-CV-176, 2011 WL 2682177, at *3-*4 (S.D. Ohio July 11, 2011) ("In the Court's view, the communications between counsel in this case do not fall within the scope of Rule 408.  In reviewing the chain of communication, it is clear that the proposals for accommodation were not made in the context of discussing potential settlement of claims asserted in this litigation but, rather, were made in an effort to determine the number of bathroom breaks that would be feasible to accommodate Plaintiff's condition."); *Williams v. British Airways, PLC*, No. 04-CV-0471, 2007 WL 2907426, at *8 n.13 (E.D.N.Y. Sep. 27, 2007) ("[S]ettlement discussions may be considered in the ADA context for the purpose of assessing a party's participation in the interactive process.").  Cook's motion to strike the affidavit is therefore DENIED.

## B.    Failure to Accommodate

It is uncontested that Cook has a disability as defined by the ADA that limited her ability to work at MSSB, and she was therefore a qualified individual under the Act.  MSSB's motion for summary judgment rests on whether Cook's requested accommodation was reasonable and whether MSSB engaged in a good faith interactive process.

Because PVC and General Anxiety Disorder would not be "open and obvious" to an employer, it was Cook's responsibility to notify MSSB of the limitations caused by her disability and suggest reasonable accommodations to overcome those limitations.  *Chevron Phillips Chem. Co.*, 570 F. 3d at 621.  Cook argues that her requested accommodation was reasonable, as she merely requested to work part-time from the downtown location for three to four weeks. Dkt. 55. Hance,

Kabot, and Richmond testified that Cook could have continued to perform her job responsibilities while working on a part-time basis from the downtown office for the three or four weeks that she requested. Dkt. 55, Ex. O at 169, Ex. P at 84, Ex. S at 56. MSSB argues that it was not required to provide Cook with her accommodation of choice, just a reasonable accommodation that was in-line with its business needs. Dkt. 54. MSSB states that Cook's requested accommodation, which it asserts included a request to work at a specific location in contravention to MSSB's business needs and a request for a change in supervisor, was not reasonable.

Mabry's original note stated, "Return to work 4 hrs/day with no travel except to *main work location*." Dkt. 54, Ex. K (emphasis added). Mabry's February 2012 letter requested a return to work on a part-time basis for three weeks and indicated that Cook was "to work at the 717 Texas Ave, suite 3050 [downtown], location only, to eliminate stress and new challenges." Dkt. 55-7. The letter did not indicate how long the requested location restriction would last. In April, Cook requested, in the request for a reasonable accommodation form, to work on a part-time basis for four weeks in a familiar surrounding while being monitored by health professionals, and she also requested to work at the downtown location with no additional travel "until a full doctor's release." Dkt. 55, Ex. Q. Thus, while the duration for the part-time restriction was consistently three to four weeks once Cook returned to work, the duration of the location restriction was indefinite.

The court finds that Cook's requested accommodation of a specific work location for an indefinite period of time was not reasonable as a matter of law.[3] While a short location accommodation to alleviate stress may have been reasonable, particularly given the testimony of

---

[3] The court makes no determination as to the reasonableness of any changes to Cook's request that may have occurred as the parties attempted to engage in the interactive process.

Hance, Kabot, and Richmond that Cook could have fulfilled her basic job requirements at the downtown location, it was not reasonable to request that the employer allow Cook to work in her office of choice for an indefinite amount of time when her employer had already indicated a need for her to cross-train and improve communications with her supervisor by working at the Galleria office.   Moreover, Bruce clearly indicated in the April request, which was submitted by Cook, that Cook needed a change in supervisors.   Dkt. 54, Ex. Q.   Generally, a request for a change in supervisors is not a reasonable request for accommodation, and there is no evidence that a change in supervisors would be a reasonable request in this case.  *See, e.g.*, *Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 123 (2d Cir. 1999) (noting that in the Second Circuit, "the question of whether a requested accommodation is a reasonable one must be evaluated on a case-by-case basis" and that there "is a presumption . . . that a request to change supervisors is unreasonable"); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319 n.10 (3d Cir. 1999) ("[A] disabled employee is not entitled to a supervisor ideally suited to his or her needs" and "an employee is not entitled to transfer whenever the employee deems that his co-workers are causing him stress."); *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 526 (7th Cir. 1996) (noting that the plaintiff had requested that the court "allow her to establish the conditions of her employment, most notably, who will supervise her" and holding that "[n]othing in the ADA allows this shift in responsibility."); *see also Ghoston v. Nissan N. Am., Inc.*, No. 3:05CV766HTW-LRA, 2008 WL 879737, at *5 (S.D. Miss. Mar. 30, 2008) (collecting cases).

However, there is a question of fact with regard to the interactive process.   "Once an individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation.   The appropriate

reasonable accommodation is best determined through a flexible, interactive process that involves

both the employer and the individual with a disability." 29 C.F.R. § 1630.9, App. (Westlaw)

(Interpretive Guidance on Title I of the Americans with Disabilities Act). The employer should:

> (1) Analyze the particular job involved and determine its purpose and essential function;
> (2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;
> (3) In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and
> (4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer.

*Id.* While MSSB indicated that Cook could work part-time, thus making a significant concession

and engaging in the interactive process, what happened next is unclear. MSSB's attorney, Nancy

Patterson, states that Cook's attorney, Loyd, stated that "Cook did not wish to return to work in a

role reporting to Ms. Champagne." Dkt. 54, Ex. R. Patterson asserts that she advised Loyd that all

complex risk managers reported to Champagne and that Cook would need to "suggest another

available position for which she was qualified" if she wanted a different supervisor. *Id.* According

to Patterson, Loyd never provided any suggestions. *Id.* Loyd, on the other hand, states that he

"***never*** told Patterson or any other Morgan Stanley attorney, employee, or agent that Cook could not

return to work, that Cook refused to work in a position reporting to Helen Champagne, that Cook

resigned or was going to resign or that Cook would only return to work if she received a change in

supervisor." Dkt. 55-30. Since the evidence of the extent to which the parties engaged in this

interactive process conflicts, the court is unable to grant summary judgment at this time.  MSSB's

motion for summary judgment on the accommodation claim is therefore **DENIED**.

## C.    Retaliation

MSSB also seeks summary judgment on Cook's claim that MSSB unlawfully retaliated

against her protected activity of filing a complaint with the EEOC by terminating her employment.

Dkt. 54 at 1.  MSSB contends that Cook cannot establish a  prima facie case of retaliation, and even

if she could, MSSB had a legitimate, non-retaliatory reason for terminating Cook's employment.

*Id.* at 20.  Finally, MSSB argues that Cook cannot demonstrate that its legitimate, non-retaliatory

reason for the termination was pretext for retaliation.   *Id.*

### 1.    Prima Facie Case

To establish a prima facie case, Cook must demonstrate that (1) she engaged in a protected

activity, (2) she suffered an adverse employment action, and (3) there was a causal connection

between the two.  *Hernandez*, 670 F.3d at 657.  Neither party disputes that Cook engaged in the

protected activity of filing a complaint with the EEOC or that she suffered an adverse employment

action when MSSB terminated her employment.  Dkt. 54 at 20.  MSSB, however, contends that

Cook cannot demonstrate a causal connection between her EEOC complaint and the termination

because she provides no evidence beyond temporal proximity to support that conclusion, and since

the termination occurred " almost seven months" after the EEOC complaint, "the time lapse between

the two is insufficient to support a finding of a causal connection on summary judgment."  *Id.* at 21.

Cook counters that the close temporal proximity between the EEOC's issuance of her notice of right

to sue and her termination—"***just days***"—is sufficient to establish causation when viewed together

with the "sudden frenzy to terminate Cook immediately after the Right to Sue Letter was issued." Dkt. 55 at 22–23 (emphasis in original).

The temporal proximity between Cook's EEOC complaint and her termination is not close enough to support a finding of a causal connection without further evidence of retaliation. "[C]ases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508 (2001). The Fifth Circuit has "note[d] that 'a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes.'" *Evans v. Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (internal citations omitted). In addition, the Fifth Circuit has held that a "five month time period" with no other evidence of retaliation is not sufficient to establish a causal connection. *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471–72 (5th Cir. 2002). Here, Cook filed her EEOC complaint in May 2012 and was terminated in December 2012. Dkt. 55, Ex. J. That time gap is greater than five months and cannot support a finding of a causal connection without other evidence.

While it is undisputed that Cook was terminated from MSSB days after she received the right-to-sue notice, the prima facie case requires that the adverse employment action be causally connected to a *protected activity* by the employee. *Hernandez*, 670 F.3d at 657. As the Supreme Court has observed in dicta, it is an "utterly implausible suggestion that the *EEOC's* issuance of a right-to-sue letter—an action in which the employee takes no part—is a protected activity of the

employee.'"[4]  *Breeden*, 532 U.S. at 273 (emphasis in original).  The prima facie case that requires a causal connection between an adverse employment action and an *employee's* protected activity.  If the evidence were that the termination occurred after the EEOC's investigation concluded and the EEOC decided to issue a notice of right to sue, the temporal proximity between the termination and the notice of right to sue would be insufficient to raise an issue of material fact as to a causal connection.

This case, however, does not involve simply receiving a right-to-sue letter.  Here, Patterson states that Loyd advised her that he would be "requesting a right to sue and would move forward with filing a claim against MSSB."  Dkt. 54, Ex. R.  While the date on which a person receives a notice of right to sue generally depends on when the EEOC completes its investigation, a person may request a notice of right to sue before the EEOC has completed its investigation.  *See Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 470 (3d Cir. 2001).  Here, the evidence indicates that Cook, through Loyd, did just that, and that Loyd advised MSSB that Cook would be filing suit.  *See* Dkt. 54, Ex. R (Patterson Decl.); Dkt. 55, Ex. K (notice of right to sue, which indicates that the EEOC was terminating its processing of the charge).

Cook asserts that MSSB was in a "frenzy to terminate" her employment after it received the notice of right to sue.  Dkt. 55 at 23.  Hance followed up with Metlife regarding Cook's appeal on

---

[4]  Cook cites three circuit court decisions that conclusorily treat EEOC right-to-sue notices as protected activity.  Dkt. 55 at 21–22 (citing *Freytes-Torres v. Sanford*, 270 Fed. App'x 885 (11th Cir. 2008) (unpublished); *Smith v. Salem*, 378 F.3d 566, 571 (6th Cir. 2004); *Galindo v. Roma Police Dep't.*, 265 F.3d 1059, No. 99-40841, 2001 WL 872779, at *8 (5th Cir. July 6, 2001) (unpublished)).  None of these cases cite *Breeden* or discuss why they treat the right-to-sue notices as protected activity.  Furthermore, the plaintiff in the Fifth Circuit case, which is not published and has no precedential value, provided sufficient other evidence to support a reasonable jury's finding of retaliation.  *Galindo*, 2001 WL 872779 at *1; *see* Fifth Circuit R. 47.5.4.

December 5, 2012, and then asked her assistant to obtain Metlife's denial letter and the date Cook was notified of denial. Dkt. 55, Exs. W, X. Soon thereafter, on December 10, 2012, Hance sent the termination letter to Cook. *Id.*, Ex. O. The court finds that terminating Cook's employment within days of receipt of the notice of right to sue when Cook's attorney advised MSSB that he was requesting a right-to-sue notice and would be filing suit raises a question of material fact regarding the causal connection between the protected activity and the adverse employment action.

MSSB argues that even if Cook could raise a question of material fact with regard to prima facie case, the court should grant summary judgment in MSSB's favor because it had a legitimate non-retaliatory reason for terminating Cook's employment. Dkt. 54. Specifically, MSSB asserts that it was justified in terminating Cook's employment because Cook refused to return to work after her disability and Family Medical Leave Act leave. Dkt. 54 at 22. Cook argues that neither she nor her attorney ever stated that she would not return to work. Dkt. 55. This creates a question of material fact with regard to the employer's burden. There is no need to reach the pretext inquiry. MSSB's motion for summary judgment on the retaliation claim is **DENIED**.

### III. CONCLUSION

For the foregoing reasons, MSSB's motion for summary judgment is **DENIED**.

Signed at Houston, Texas on August 14, 2014.

_____
Gray H. Miller
United States District Judge

18